# EXHIBIT A

1

```
  1                     IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                              EASTERN DIVISION

  3   NORTH HAVEN LODGING PARTNERS      )
      LLC and WALLINGFORD LODGING       )
  4   PARTNERS LLC,                     )
                                        )
  5              Plaintiffs,            )    No. 23 CV 16264
                                        )
  6     v.                              )    Chicago, Illinois
                                        )    December 28, 2023
  7   McMANN COMMERCIAL LENDING LLC,    )    11:00 a.m.
      now known as McMANN PROFESSIONAL  )
  8   SERVICES LLC, McMANN CAPITAL,     )
      and GENIE INVESTMENTS NV,         )
  9                                     )
                 Defendants.            )
 10
                  TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
 11                 BEFORE THE HONORABLE JOHN F. KNESS

 12   APPEARANCES:

 13   For the Plaintiffs:         FOLEY & LARDNER LLP
                                  BY:  MR. ANDREW THOMAS McCLAIN
 14                               321 North Clark Street
                                  Suite 2800
 15                               Chicago, Illinois  60654

 16   For the McMann              SWK ATTORNEYS
      Defendants:                 BY:  MR. DANIEL S. KLAPMAN
 17                               500 Skokie Boulevard
                                  Suite 600
 18                               Northbrook, Illinois  60062

 19   For the Defendant Genie     WALKER LAW OFFICE
      Investments:                BY:  MR. ADAM B. WALKER
 20                               4050 Pennsylvania Avenue
                                  Suite 115-10
 21                               Kansas City, Missouri  64111-3041

 22

 23

 24

 25
```

Nancy C. LaBella, CSR, RDR, CRR
Official Court Reporter
219 South Dearborn Street, Room 2128
Chicago, Illinois  60604
(312) 435-6890
NLaBella.ilnd@gmail.com

1    (Proceedings had in open court:)

2        THE CLERK:  23 cv 16264, North Haven Lodging Partners

3  LLC, et al., v. McMann Commercial Lending.

4        THE COURT:  Please approach the podium.  Plaintiff on

5  this side, defendant on that side (indicating).

6    (Brief pause.)

7        THE COURT:  Good morning.

8        MR. McCLAIN:  Good morning, your Honor.  Andrew

9  McClain on behalf of the plaintiffs, North Haven Lodging

10  Partners and Wallingford Lodging Partners.

11        THE COURT:  Good morning, Mr. McClain.  Are you the

12  lead counsel on this case?

13        MR. McCLAIN:  I am not the trial counsel on this

14  case.  That is William McKenna of my firm.

15        THE COURT:  And I know you're a very capable lawyer,

16  but why is Mr. McKenna not here for an important hearing?

17        MR. McCLAIN:  Mr. McKenna entrusted me to attend this

18  hearing, your Honor.

19        THE COURT:  That's not an answer to my question.  Why

20  is Mr. McKenna, as lead trial counsel for this case, not here

21  at this hearing?

22        MR. McCLAIN:  Because he delegated this hearing to

23  me, your Honor.

24        THE COURT:  That's still not an answer, but that's

25  all I'm going to get.  Please tell Mr. McKenna that when I set

1   a temporary restraining order hearing, I expect lead counsel

2   to be there for this.  I don't know where he is.  I'm sorry if

3   this is inconvenient for him.  I'm here, defense counsel is

4   here, you're here.  If he doesn't want to show up for arguably

5   the most important hearing in a case, that doesn't reflect

6   particularly well on him.

7           I expect lead counsel at substantive hearings.

8   Please convey that to him.

9           MR. McCLAIN:  Understood, your Honor.  Thank you.

10          THE COURT:  Who is appearing on behalf of McMann

11  Commercial Lending LLC?

12          MR. KLAPMAN:  I am, your Honor.  Dan Klapman.

13          THE COURT:  Good morning, Mr. Klapman.

14          MR. KLAPMAN:  Good morning.

15          THE COURT:  And on behalf of Genie Investments?

16          MR. WALKER:  Adam Walker, your Honor.

17          THE COURT:  Good morning, Mr. Walker.

18          I have received a motion for a TRO.  I looked at the

19  briefing on it and the attachments.  And I'm not going to

20  claim that I have full knowledge of every clause in all of the

21  various funding agreements and loan agreements.  But I've read

22  the declarations.  I've read the motions.

23          I entered an order suspending briefing because I

24  wanted to get everybody in here so that I could find out

25  what's going on and hopefully issue some further guidance in

1    this case at this point.  And maybe it will involve some
2    additional briefing.  I don't know.

3         But at the outset, the question I have with respect
4    to whether a TRO is appropriate is, what is the argument from
5    the plaintiffs' perspective that there's no adequate remedy at
6    law and that there's a risk of irreparable harm?  Because as I
7    look at things, I suspect you're probably right as a legal
8    matter that the Grupo, G-r-u-p-o, Mexicano, M-e-x-i-c-a-n-o,
9    case doesn't preclude the imposition of a prejudgment asset
10   restraint.  But I think that's perhaps a slightly separate
11   question of whether you're left without an adequate remedy at
12   law.

13        So I'd like to hear first from the plaintiffs whether
14   you really believe there's an inadequate remedy at law and a
15   risk of irreparable harm.

16        MR. McCLAIN:  Thank you, your Honor.

17        Yes, we do believe that there's an inadequate remedy
18   at law and that there's a risk of irreparable harm here, your
19   Honor, because -- for several reasons.

20        First, your Honor, we are seeking equitable relief
21   here in the form of a constructive trust, as well as
22   fraudulent transfer claims.

23        THE COURT:  Let me jump in there because this is a
24   question that came to my mind.  Even if -- and there might be
25   an equitable remedy.  You're also seeking a legal remedy,

1    correct?

2              MR. McCLAIN:  We are, your Honor.

3              THE COURT:  So as a matter of law -- and this is not

4    a trick question; I don't know the answer to this -- where a

5    party is seeking both legal and equitable remedies, does the

6    mere existence of a potential equitable remedy for purposes of

7    the Rule 65 standard mean that there is, by force of law, no

8    adequate remedy at law?

9              In other words, we're talking about the law of

10   remedies here.  You have a potential legal remedy and you have

11   a potential equitable remedy.  If there is a potential legal

12   remedy, is that enough under the preliminary injunction test

13   to say that there is an adequate remedy?  Do you see my

14   question?

15             MR. McCLAIN:  I do, your Honor.  And I believe I

16   understand it.  And I don't think the mere fact that you

17   allege an equitable claim is dispositive to the issue.

18             I think the dispositive facts here, your Honor, are

19   the nature of our claims and the history of the parties'

20   relationship here.

21             As we set forth in our motion and in our complaint in

22   the declarations, there is a history of stonewalling.  There's

23   a history of potentially fraudulent oral and written records

24   by both parties here.  And the record there is what creates

25   our inadequate remedy at law because, your Honor, we do not

1    believe that we are potentially going to be able to ever

2    collect from these individuals, given their history of failing

3    to refund these funds, failing to adhere to their contractual

4    and legal obligations to us.

5         THE COURT:  Isn't that the case or the situation in

6    every case though?  I mean, if you sue someone for breach of

7    contract, there's always a risk there that they're going to be

8    judgment proof, correct?  So why -- under your view doesn't

9    that suggest that in every case where there's a chance that

10   the plaintiff might not be able to recover a money judgment,

11   that the court -- and if the plaintiff has also asserted

12   equitable remedies in the alternative, doesn't that suggest a

13   court should routinely be issuing asset restraints?

14        MR. McCLAIN:  No, I don't believe so, your Honor.

15   And I think that's where the Supreme Court was going in Grupo.

16   However, there are exceptions to that, particularly when you

17   look at the nature of the claims and the acts of the debtors

18   or the defendants in those cases.

19        The Caterpillar case is a great example, your Honor,

20   where the individual defendants as well as the entity

21   defendants engaged in a series of deceptive and fraudulent

22   acts.  And, there, the court did issue a temporary restraining

23   order and a preliminary injunction.

24        THE COURT:  Mr. McClain, would you give me a cite for

25   that, please.

```
 1              MR. McCLAIN:  That's 880 F.Supp. 578 of the Central
 2     District of Illinois.
 3              And there, your Honor, the issue was, there was a
 4     licensing agreement; and the defendants misrepresented
 5     numerous sales and their books and records to the plaintiffs
 6     in an attempt to avoid paying royalties.  And in part of the
 7     court's reasoning in issuing the temporary injunction, the
 8     court stated, Considering the defendants' past intentional
 9     deceptive bad acts, the court finds that there is a high
10     probability that, absence a preliminary injunction, the
11     defendants would engage in further acts designed to defraud
12     the plaintiffs and frustrate enforcement of any judgment.
13              And there, your Honor, I think is the key point, is
14     that they will continue to engage in deceptive and fraudulent
15     acts as we've seen here time and time again.  We've given the
16     defendants an opportunity to refund these funds.  They have
17     not done it.  We've also given them an opportunity to show us
18     what is actually going on, and they have not given us any
19     detail exactly of what's going on.
20              And we are very concerned, your Honor, that if a
21     temporary restraining order and a preliminary injunction is
22     not issued as to the $3.6 million -- that they admit we have
23     paid, that they admit that we are owed -- that that money is
24     going to be further dissipated, your Honor.
25              THE COURT:  Well, I think McMann admits that you're
```

1  owed it.  I'm not sure Genie does.  From your perspective,

2  what is the evidence that Genie admits that the money is owed?

3          MR. McCLAIN:  Your Honor, the representative of

4  Genie, David Hughes, has stated both in writing and orally to

5  my clients that he is working to refund the funds.  And he

6  actually provided a date certain of October 13th that they

7  were going to refund the funds to my clients.  And they have

8  blown past all of the deadlines that they've given themselves

9  to refund these funds.

10         THE COURT:  Let me jump in.  This is sort of an

11  ancillary question in my mind, but I'm trying to get an

12  understanding of the facts here, as well as the legal

13  arguments.

14         So the money that was handed over by plaintiffs as

15  effectively an advance on the interest that would be owed

16  under the lines of credit -- I have that much right so far?

17         MR. McCLAIN:  That's correct, your Honor.

18         THE COURT:  Okay.  Was that transaction secured in

19  any way by any other thing of value?

20         MR. McCLAIN:  From the borrowers' perspective, we

21  didn't have security per se in that interest payment made.

22  The lenders did have security on the overall loan.  But the

23  loan was never made, your Honor.

24         THE COURT:  Right.

25         MR. McCLAIN:  And that's part of the issue.

1    THE COURT:  That was going to be my next question.  I

2   presume that under the documents -- I haven't located chapter

3   and verse on that yet -- but I presume any monies that were

4   provided by the lenders in connection with this hotel project

5   were going to be secured by something, either the real

6   property or something else.  But you're telling me effectively

7   that the -- how much was it, 1.6 each --

8    MR. McCLAIN:  It was 1.8.

9    THE COURT:  1.8, that's right.  Each of the

10  $1.8 million payments was totally unsecured from the

11  plaintiffs' perspective?

12    MR. McCLAIN:  From the plaintiffs' perspective, it

13  was unsecured in that it was prepaid interest on the loan that

14  the lender was supposed to account for on its books and

15  records.

16    We would claim now at this point that we've paid

17  $3.6 million to the lenders, and they have refused to refund

18  the money.  At a minimum, we would have some type of equitable

19  lien on those funds because those are our liens.

20    But if your Honor is asking if there's a written

21  security agreement for those funds from -- flowing from the

22  plaintiff to the lenders, there is not, your Honor.

23    THE COURT:  And that's fine.  I'm not saying that

24  they had some obligation.  I just want to understand the lay

25  of the land here.

1        But to sort of boil down what you're saying, you're

2   basically telling me that you think that one or both of the

3   defendant entities is going to be judgment proof, correct?

4        MR. McCLAIN:  That is part of our argument of why we

5   think there's irreparable harm and no adequate remedy, your

6   Honor.  They have shown time and again -- and, in fact, Genie

7   has admitted that it lacks the capital to refund these ICA

8   payments until it receives payment from some unknown third-

9   party capital provider.

10       And I will tell your Honor that yesterday afternoon,

11  we were contacted by Mr. Walker, Genie's counsel, who

12  indicated that he allegedly reached an agreement in

13  arbitration with the unknown capital provider, such that Genie

14  believes that they will be able to, quote, immediately pay us

15  the ICA payments sometime after January 2nd.

16       We have no proof of the veracity of those statements,

17  but it furthers our point, your Honor, that they continue to

18  string us along.  And if they do, in fact, have some sort of

19  settlement or agreement in principle, then there is no harm

20  and no risk to Genie for the Court to issue a preliminary --

21  or, excuse me -- for the Court to issue a temporary

22  restraining order at this point until they allegedly reach

23  some settlement and can pay us.

24       The Court can issue a 14-day TRO --

25       THE COURT:  Let me jump in there.  Let's assume --

1    and I haven't made a decision -- let's assume I impose some

2    sort of preliminary injunctive relief, whether a TRO or a

3    preliminary injunction down the road, what exactly am I

4    retraining or what exactly am I enjoining?  Are there specific

5    accounts?  Are there specific funds or things of value that

6    you're asking me to restrain?

7           I mean, we get cases in this district all the time in

8    the trademark world.  They're called Schedule A cases.  And

9    judges routinely issue prejudgment asset restraints based on

10   the assertion of potential equitable remedy of an accounting

11   of profits.  But what we are restraining at that point

12   typically is accounts at Amazon or Etsy or eBay, any of a

13   number of places.  So there's some item that we're saying,

14   you, third-party provider, can't do anything with that money;

15   it's locked down.

16          What exactly are you asking me to restrain here?

17          MR. McCLAIN:  Your Honor, we are asking you to issue

18   an order against both of the defendants in personam, and that

19   they are restricted from releasing $3.6 million wherever it is

20   located.  We have a specific account number that these funds

21   were transferred into.  So it, at a minimum, would apply to

22   that account.  But we have no knowledge or awareness of other

23   accounts that these defendants might have.

24          So the restriction would be that the defendants are

25   restricted from transferring $3.6 million and from

1    transferring any other assets that are equivalent to the funds

2    that we transferred to the defendants, so $3.6 million.

3         THE COURT:  Thank you, Mr. McClain.

4         Let me make sure I understand the evidence that

5    you're putting forth to me now in support of your argument

6    that there is a risk of -- an inadequate remedy at law because

7    the defendants would be effectively judgment proof.

8         It's that they have -- and this is very colloquial,

9    not your words -- but they've jerked you around on the money

10   thus far; you have other evidence that some other individuals

11   that -- you've gotten this through internet searches in

12   part -- other individuals have given these defendants money

13   and not gotten it back; that they've promised the money but

14   haven't delivered it.

15        What other evidence -- and, first of all, do I have

16   that right?  And, second, what other evidence do you have?

17        MR. McCLAIN:  Yes, your Honor, that is part of our

18   evidence.

19        The other evidence that we have are the actual

20   writings between the parties that relate to all of those

21   issues you just discussed.

22        Additionally, McMann has yet to ever fund this loan,

23   your Honor.  They were supposed to fund it within 75 days of

24   payment of the ICA payments.  That has never happened.  And

25   so, that, we think, is further evidence of their questionable

1   financial structure and standing and gives us further concern

2   that we're not going to be able to collect on any sort of

3   judgment down the road, your Honor.

4          THE COURT:  So it's basically a "where there's smoke,

5   there's fire" argument?

6          MR. McCLAIN:  I think there's more than smoke here,

7   your Honor.  I think that there's fire.  And the October 24th

8   letter from McMann's counsel to Genie, I think, potentially

9   could be considered a smoking gun, your Honor.  There are

10  significant admissions in that letter on behalf of McMann that

11  relate to the parties' relationship, between Genie and McMann;

12  relate to admissions that the plaintiffs are owed this money;

13  relate to admissions that no party, McMann or Genie, have any

14  good-faith or legal basis to refuse to refund these funds; and

15  that we are entitled to these funds.

16         THE COURT:  All of which, I think, you've made a very

17  strong case on here.  And I don't dispute that, based on the

18  limited record before me right now.

19         But one of the key questions obviously, as you know

20  very well, in whether to issue preliminary injunctive relief

21  is whether there is an adequate remedy at law.  And that's

22  really the thing I'm focusing on.

23         So I'm going to get back to you, Mr. McClain.  Thank

24  you for your very well-presented argument.

25         Let me turn first to McMann's counsel, Mr. Klapman,

```
 1   and ask you to tell me what your views are.
 2           MR. KLAPMAN:  Handful of views, Judge.  There's a lot
 3   of different arguments.  Basically --
 4           THE COURT:  Could you come closer to the microphone,
 5   please.
 6           MR. KLAPMAN:  Sure.
 7           THE COURT:  Thank you.
 8           MR. KLAPMAN:  So first issue, Judge -- well, I guess
 9   the meat of it is, is that this is a case where --
10           THE COURT:  Let me cut to the chase.
11           MR. KLAPMAN:  Yes.
12           THE COURT:  Does your client have the money to pay
13   the 1.6 or 3. -- I'm sorry, 1.8 or 3.6 million, whatever you
14   think is owed, does your client have that money or not?
15           MR. KLAPMAN:  No.  My client was never given that
16   money.  My client doesn't have that money.  I mean, I'm not
17   going to give evidence on behalf of my client as to their
18   financial circumstances.  I don't know what their --
19           THE COURT:  Well, you kind --
20           MR. KLAPMAN:  -- specific assets --
21           THE COURT:  -- of have to because --
22           MR. KLAPMAN:  -- are.
23           THE COURT:  -- this is a TRO and he's saying you're
24   judgment proof.  So my question for you is, are you judgment
25   proof?
```

```
 1              MR. KLAPMAN:  I don't believe they're judgment proof,

 2   Judge.

 3              THE COURT:  Okay.

 4              MR. KLAPMAN:  I don't think they have the money to

 5   make that refund right now.

 6              THE COURT:  And --

 7              MR. KLAPMAN:  Your Honor is asking --

 8              THE COURT:  -- I understand you're --

 9              MR. KLAPMAN:  -- me that --

10              THE COURT:  -- not waiving --

11              MR. KLAPMAN:  -- straight up.

12              THE COURT:  -- any other defenses or arguments.  I

13   understand --

14              MR. KLAPMAN:  And I can't give --

15              THE COURT:  -- that.

16              MR. KLAPMAN:  -- evidence on their --

17              THE COURT:  Let me finish, please.

18              I understand you're not waiving any arguments or

19   anything else with respect to the merits of the case.  But I'm

20   very interested in the question of whether, if the plaintiff

21   succeeds in getting a judgment, would that judgment be

22   worthless because McMann doesn't have the money to pay the

23   judgment.

24              MR. KLAPMAN:  I can't say that they're -- they're in

25   operating business, Judge.  So they're not -- it's not like
```

1    they've dissolved.  They're still operating.  I don't know the

2    full extent of their operating capital.  And I haven't

3    addressed that with my client because they, frankly, never saw

4    this money.  It's never been in their possession.  The ICA

5    payments that they're looking to get back were wired directly

6    to Genie.

7           THE COURT:  Okay.  Let me come back to you because I

8    want to ask Genie's counsel, Mr. Walker -- and if you could

9    pull the microphone toward you, that would be helpful.

10          Does Genie have the money to satisfy any judgment

11   that might come down the road?

12          MR. WALKER:  They don't presently have it.  But as

13   Mr. McClain alluded to, we are in arbitration with a debtor of

14   Genie who owes a very substantial contract amount.  And we are

15   also in active settlement discussions and, as of yesterday

16   afternoon, reached an agreement in principle that would be --

17   that would put them in a situation where they had the

18   liquidity to satisfy a judgment in this case.

19          THE COURT:  What would the time frame be,

20   hypothetically -- I'm not viewing anything you say right now

21   as binding.  But, hypothetically, what would the time frame be

22   for a full repayment of the $3.6 million to the plaintiff in

23   this case?

24          MR. WALKER:  Well, that would depend on whether the

25   settlement proceeds as we've negotiated it, in which case, I

1    would think --

2           THE COURT:  Let me interrupt.  I'm sorry.  The

3    settlement discussions are between Genie and the funder?

4           MR. WALKER:  Yes.

5           THE COURT:  You're not talking about settlement

6    discussions with North --

7           MR. WALKER:  No, with --

8           THE COURT:  Okay.

9           MR. WALKER:  -- with the party that owes Genie this

10   considerable amount of money.  If that proceeds as planned, I

11   believe the repayment to any affected borrowers -- and I have

12   more to say about whether the plaintiffs fall into that

13   category or not -- I would think would be done by the end of

14   January, if not considerably sooner than that.

15          If the settlement falls through, we have to proceed

16   to a full arbitration hearing.  That's currently scheduled, I

17   believe, for either late May or early June of this year.  So

18   we would probably be looking at midsummer for an award in that

19   arbitration proceeding.

20          THE COURT:  Let me ask you this, Mr. Walker, in view

21   of what you're telling me, which is that you think that Genie

22   is going to get -- there's a good chance, at least, that Genie

23   is going to get the money -- by the way, if I get any of this

24   wrong, you're welcome to correct me; I won't be offended --

25   there's a good chance Genie is going to get the money to be

1  able to refund these payments to the plaintiffs, then is there

2  any appetite on the part of Genie for an agreed injunction at

3  this point restraining $3.6 million of that money pending

4  resolution of that?

5       MR. WALKER:  There's not, your Honor.  And that's

6  because currently Genie is in a highly illiquid situation.

7       THE COURT:  They're broke?

8       MR. WALKER:  They're -- nearly.  I mean, I don't know

9  the full details of it.  But they're also facing -- they need

10  funds to pursue the arbitration and they need funds to defend

11  against this lawsuit and a couple of others that have been

12  brought against it by borrowers.  And they're also starting to

13  hear from regulators in response to complaints.  So this is

14  all flowing downhill from its -- you know, from Genie's

15  difficulty collecting this outstanding receivable, which is

16  quite large.  But at the moment, if they were to have any of

17  their assets frozen, they would really be in a bind in terms

18  of being able to do what's in the best interests of the

19  borrowers who are affected by this, which includes plaintiffs,

20  and also stay alive as a going concern.

21       Their operations at the moment are pretty bare bones.

22  They obviously don't have money to fund new loan agreements.

23  But they have outstanding loan agreements that they're

24  servicing.  They have personnel who are working on their

25  behalf, things like that.  They are looking for alternate

1    sources of capital, all of which require some operating

2    budget.

3              THE COURT:  All right.  Thank you, Mr. Walker.

4              Let me turn back to Mr. Klapman because I interrupted

5    you and I didn't give you a chance.  Why don't you give me a

6    summary of your position on this motion.

7              MR. KLAPMAN:  It's multi-facetted.

8              First, I think the main issue here -- we have the

9    same issue with you in regards to an adequate remedy at law.

10   This is a legal action.

11             Under Grupo, you know, the bar on any prejudgment

12   attachment without a significant nexus to the property that

13   they're seeking to tie up, this is just a contract claim that

14   they've pled, you know, equitable claims to try and get around

15   it.  Did they make a good effort?  Sure.  But we think those

16   equitable claims are all highly suspect.  I could go through

17   each one of them in the complaint if you'd like me to.

18             But the big piece here, Judge, is that there's

19   substantial amount of case law out there that makes it very

20   clear that, without a specific nexus, just pleading equitable

21   claims is not going to take a contract claim and turn it into

22   a situation where a TRO would be appropriate.

23             So I can argue about the TRO.  If there are other

24   things that you want to know first, I'd be glad to tell you.

25   But I have a lot to get into if you want me to get into the

1    propriety of a TRO in this instance.

2         THE COURT:  Let me give Mr. Walker an opportunity to

3    summarize your position because I jumped in and asked you a

4    lot of questions at first.  So tell me what your position is,

5    please.

6         MR. WALKER:  Well, first of all, I agree with what

7    Mr. Klapman just said about the essence of this case being a

8    breach of contract action and the equitable claims made in

9    support of that being essentially contract claims recast in

10   equity for the purpose of avoiding the restrictions imposed by

11   Grupo.

12        But at a more basic level --

13        THE COURT:  I'm going to let you finish, but I

14   have -- you prompted me to think of a question about Grupo.

15   But I'm going to censor myself and let you go ahead.  I'll

16   come back to it.

17        MR. WALKER:  Well, I want to back up a little bit

18   because I think it's important for the Court to understand

19   that Genie has never had a contract with the plaintiffs.

20   Genie has never owed a debt to the plaintiffs.  Genie has

21   never had possession of any property that belongs to the

22   plaintiffs.  Genie has never had a fiduciary duty to the

23   plaintiffs.  Genie never promised to refund money to the

24   plaintiffs by a date certain.  And Genie never agreed to hold

25   any property or money in trust for the plaintiffs.

1              THE COURT:  Who did?

2              MR. WALKER:  Well, the situation is that Genie lent

3    money to McMann Commercial as a -- what's called a white

4    labeler.  So they make a loan to McMann.  McMann, in turn,

5    takes the same funds that it just borrowed from Genie and,

6    pursuant to a separate contract, lends them out to a

7    downstream borrower.  And in this case, it was the two

8    plaintiffs who were the downstream borrowers.

9              The only contract that plaintiffs have standing to

10   sue on is the contract between them and McMann.

11             The ICA payments that they each made of $1.8 million

12   were payments to McMann.

13             Now, McMann owed the same amount to Genie pursuant to

14   a separate contract.

15             And so what happened when plaintiffs wired $3.6

16   million to Genie in May of 2023 was that they just simply

17   lumped the payment to McMann in in the same transaction.  It

18   was purely for administrative convenience.  So we could have

19   insisted -- Genie could have insisted that plaintiffs wire

20   that money to McMann and that McMann, in turn, wire it to

21   Genie, but they didn't do so.

22             Nonetheless, as a matter of contract, the payments

23   that plaintiffs made were made to McMann.  So if plaintiffs

24   are owed a refund, it is owed by McMann.

25             Now, again, for administrative convenience, because

1    we know where the -- the source of the initial funding was to

2    come from Genie.  Genie has almost identical obligations to

3    McMann that McMann has to plaintiffs.  The only real

4    difference is, in the Genie-McMann contract versus the McMann

5    contracts with the plaintiffs were the names of the parties

6    and the interest rates charged and some other fees that were

7    charged.  Because, as a white labeler, they basically mark it

8    up slightly.  But it's to their benefit to act in the capacity

9    of a white labeler because they can prevent borrowers from

10   circumventing them and going straight to Genie and getting a

11   lower rate.

12         So I think it's very important to understand that

13   that's how this starts.  That's where the obligations arise

14   from.

15         I did want to respond to one thing that Mr. McClain

16   said about David Hughes, who is a principal of Genie,

17   supposedly promising to refund money to plaintiffs by October

18   13th, 2023.  There are two problems with that.  One is that he

19   never promised that he would refund money to the plaintiffs

20   because Genie does not acknowledge -- or does not believe that

21   it owes money to the plaintiffs.  Genie may owe money to

22   McMann.  That's not really at issue in this suit.

23         He also did not promise that there would be refunds

24   issued by October 13th, 2023.  And, your Honor, you can look

25   at the attachments to the motion that we're here discussing

1    where it very clearly says, in Mr. Hughes' words, the expected

2    date of the refund is October 13th, 2023, which is hardly a

3    guarantee and hardly a promise.  It's very clearly

4    aspirational or, you know, based on a reasonable expectation.

5         The -- so with that as the backdrop, Genie contends

6    that it simply has no obligation directly to the plaintiffs.

7    Notwithstanding that, when Genie is able to return to a more

8    liquid position, it fully intends to work with McMann to

9    resolve outstanding debts to borrowers who have contracted

10   with McMann.

11        But there's no basis for imposing any sort of

12   injunctive relief against Genie based on the operative facts.

13        THE COURT:  Okay.  Thank you.

14        Mr. McClain.

15        MR. McCLAIN:  Yes, your Honor.  Numerous things that

16   I want to address as a result of all of these statements.

17        But I think the common theme that we just took away

18   from there, your Honor, is everything that they just said

19   confirms our fears and why there's a necessity for a TRO here.

20        The first, your Honor, I will address is Genie's

21   comments regarding their payment.  This alleged settlement

22   payment is coming from a debtor of Genie.  So that means that

23   somebody else owes Genie money, and they need to rely on the

24   payment and the good faith and goodwill of this party to make

25   a payment to Genie so Genie can then fund the ICA refunds back

1    to the plaintiffs.  That is extremely concerning, your Honor.

2              Throughout the past four months, we've been told that

3    they've been working with a capital provider.  In layman's

4    terms, a capital provider seems to suggest an investor or

5    someone who is voluntarily giving money, as opposed to a

6    debtor who is obligated under some sort of legal obligation to

7    pay you money; they are indebted to you.  So this further

8    confirms our fears.

9              The second point, similarly, your Honor, is that

10   Genie is highly illiquid.  They don't have the funds right

11   now.

12             And to your point, your Honor, about the adequate

13   remedy and whether somebody -- the defendants need to be

14   judgment proof, I think the bar is much lower than actually

15   judgment proof, your Honor.

16             The case law uses the terms financially irresponsible

17   or if the defendants will frustrate enforcement of a judgment.

18   And that's exactly what they've been doing for four months and

19   what they want to continue to do here, your Honor, is

20   frustrate our ability to collect on any sort of judgment.

21             Sticking with Genie, your Honor, I think all of the

22   statements that were just made regarding whether Genie owes us

23   a debt or whether there were promises made, I think, are

24   completely false and directly contradicted by the written

25   evidence of this case and the papers we have submitted.

1        The fact of the matter, your Honor, is these ICA

2    payments were transferred directly from the plaintiffs to a

3    bank account in the name of Genie.  We don't have any facts

4    related to whatever contract is between Genie and McMann.  The

5    fact of the matter is these funds were turned over to an

6    account entitled in Genie's name.  Genie had possession of

7    these funds.  McMann told us to wire these funds to Genie.

8    McMann delegated that authority to Genie.  So McMann cannot

9    escape their liability by pointing the finger at Genie.

10        Likewise, Genie owes us this money because they were

11    in possession of it.  And this further confirms and solidifies

12    our likely success on our equitable claims against both of

13    these entities, particularly Genie.  A constructive trust is

14    set up, your Honor, when someone has improperly gained funds

15    and the court sets up a constructive trust to preserve those

16    assets.  Here, Genie has the funds.  The Court should impose a

17    constructive trust over those funds to preserve the collateral

18    for the plaintiffs.

19        THE COURT:  Well, they just told me they don't have

20    the funds effectively.  So what evidence do you have that they

21    do have the funds?

22        MR. McCLAIN:  That's part of the issue here, your

23    Honor, is we've been operating a bit in a black box.  And

24    we've told one thing.  Now, we're being told that the payment

25    is coming from a debtor instead of an investor, a capital

1    provider.  We are very uncertain.  And that's why we request

2    in our motion an accounting.  And I think that would be

3    appropriate relief here, your Honor, particularly given

4    everything that's been stated today.

5            THE COURT:  Let me ask you this, Mr. McClain, let's

6    assume I impose a TRO, either today or at some point down the

7    road; and, again, I'm not saying I'm going to do that.  But at

8    most, that could last 28 days.  So after that, I'm going to --

9    at some point in that period, I'm going to need more evidence

10   to support your claim for a prejudgment asset restraint.

11           I'm also going to presumably need more clarity on

12   what exactly the injunction would look like.  Appellate courts

13   routinely and justifiably criticize trial-level courts for not

14   speaking clearly as to what exactly a party is being enjoined

15   to do or enjoined not to do.  So I would need a little more

16   clarity on what exactly that language would look like.

17           But ultimately we're going to be looking at a short

18   time frame here for putting this together.  So, are the

19   circumstances such that you think a full evidentiary hearing

20   can be conducted in that period and a resolution on an

21   anticipated preliminary injunction motion can be completed in

22   28 days?

23           MR. McCLAIN:  I think it depends on the level of

24   cooperation from all parties, your Honor.  I know that my

25   clients are extremely eager to get this done.  They are

1    located in India.  They are willing to travel for hearings.

2    And they -- this is a hot-button issue for them to get

3    resolved.  They're out $3.6 million here.

4         And I think one thing that might aid the Court in

5    getting clarity on whether this is possible or the feasibility

6    here would be an accounting from both parties as to these

7    funds, as to their books and records, as to the identification

8    of this capital provider or debtor.  I mean, your Honor, there

9    are so many unknowns.  And that's why we had to seek the

10   Court's intervention here, is because we've been strung along

11   and we're continuing to be strung along now because now

12   there's some Hail Mary payment going to be made from a debtor

13   of Genie.

14        THE COURT:  Here's where I am on this right now, with

15   full appreciation for the well-presented arguments from all

16   three of you, there are some factual and legal unknowns that I

17   have right now.  And I'm not going to adjudicate, one way or

18   the other, the TRO motion today.  I'm not going to do that.  I

19   need to see some briefing from the other side.

20        My reason in suspending briefing up to this point was

21   I wanted to have you all in so I could get an understanding of

22   the case.  I have a better understanding of the case, but I'm

23   a little bit unconvinced -- I'm not saying I won't be

24   convinced -- but a little bit unconvinced that a prejudgment

25   asset restraint is warranted here.  I want to hear from both

1     sides on that.  So I'm going to set an accelerated briefing

2     schedule on the TRO motion, and then I'm going to have you all

3     back in.

4            Have you had a chance to talk with each other about a

5     potential briefing schedule on this motion?

6            MR. McCLAIN:  Your Honor --

7            THE COURT:  Would you like a minute to confer with

8     each other out in the hallway about a briefing schedule?

9            MR. KLAPMAN:  Before you do that, Judge, you know,

10    you did ask a -- you asked a general question.  I was trying

11    to focus on the questions you were asking.  I think before

12    you -- and I understand you just told us where you're going.

13    There's just a few points I would like to make that may impact

14    your decision just now.

15           THE COURT:  Are you hoping that I'm going to deny the

16    TRO right now?

17           MR. KLAPMAN:  Whether you are or not, there are

18    things that I think you need to hear that are relevant.

19           THE COURT:  I'm not going to rule on the TRO right

20    now.  I'm going to let you go out and have a conference on the

21    schedule.  If you can't agree, I'll set a schedule.  And then

22    I will hear you out.  Very well?

23           MR. KLAPMAN:  Understood, your Honor.

24           THE COURT:  Okay.  Go out in the hallway and have a

25    talk.  Thank you.

1          MR. McCLAIN:  Thank you, your Honor.

2          THE COURT:  I'll stay right here.

3     (Recess taken.)

4          THE COURT:  We'll recall the case 23 C 16264, North

5    Haven Lodging and Wallingford v. McMann and Genie Investments.

6          We were on a short break while counsel conferred.

7    Let me turn to Mr. McClain and ask your perspective.

8          MR. McCLAIN:  Your Honor, we appreciate the Court's

9    issuing an expedited schedule.  We of course want as quickly a

10   schedule as possible.  We've reached an agreement, albeit over

11   a little bit of wrangling, for responses due January 10th and,

12   if the Court will indulge us, a reply due on January 17th.

13         THE COURT:  Any opposition to that from Mr. Walker

14   or --

15         MR. WALKER:  No, your Honor.

16         MR. KLAPMAN:  None from us either, Judge.

17         THE COURT:  Thank you, Mr. Klapman.

18         I will enter that schedule.  I will set a hearing

19   after January 17th.  Let's find a date.  I have a criminal

20   trial starting the 16th, so I think you will be -- let me

21   look.  One second, please.

22     (Brief pause.)

23         THE COURT:  I will set a telephonic hearing for

24   9:00 a.m. on Friday, the 19th.  That's the best I can give you

25   right now because I have a number of other matters set on the

1   shoulders of the trial day.  So we'll see where things are.

2   That will be as much for case tracking purposes as for the

3   substance because when we have jury trials, we have to start

4   promptly at 9:30.  So we'll see where things are at 9:00 a.m.

5   on that Friday, subject to setting longer, more substantive

6   hearings beyond that.  So I need to see what you all say in

7   writing and then have something on the call to keep things

8   moving forward at 9:00 a.m. on Friday, the 19th.

9        Is there any problem with that date, Mr. McClain?

10        MR. McCLAIN:  No, your Honor.

11        THE COURT:  Very well.

12        How about from either of the defendants?

13        MR. KLAPMAN:  No, your Honor.

14        MR. WALKER:  No, your Honor.  Appreciate the

15   telephonic hearing as well.

16        THE COURT:  All right.

17        MR. KLAPMAN:  The only other issue we have, Judge, is

18   we've got an answer date in regards to the complaint.  We were

19   talking -- we figured we would ask you.  While counsel for the

20   plaintiff was amenable to an extension in regards to when we

21   should answer or otherwise plead -- we anticipate a 12(b)(6)

22   motion on everything -- we were asking that it be held until

23   further order of the Court so we can deal with the TRO, or we

24   can choose a date today by which to answer or otherwise plead.

25        THE COURT:  What's the plaintiffs' view?

1          MR. McCLAIN:  Your Honor, we wanted the response to

2     be filed at the same time as the response to the TRO, given

3     their current answer deadline of January 2nd.

4          THE COURT:  So that would be the 10th?

5          MR. McCLAIN:  Yes, your Honor.

6          THE COURT:  I'm going to give them a little more time

7     but not a huge amount.  I'll give you until the 26th to answer

8     or otherwise respond to the complaint.

9          One moment, please.

10       (Brief pause.)

11         THE COURT:  Mr. Klapman, I will tell you that I'm not

12    going to extend that any further, so January 26th is your date

13    to respond to the complaint.

14         MR. KLAPMAN:  Understood.

15         THE COURT:  I would encourage you to look at Seventh

16    Circuit case law on motions to dismiss.  They, number one, do

17    not -- if there's a motion to dismiss, it does not typically

18    act automatically to stay discovery.  Second, the Seventh

19    Circuit has issued a lot of opinions over the years on the

20    pleading standard.  And this doesn't strike me as a case where

21    a motion to dismiss might necessarily be all that viable.  But

22    I'll leave it up to you.  I take the Seventh Circuit's case

23    law very seriously on what the pleading standards are.  I get

24    a lot of motions to dismiss, and I deny a lot of motions to

25    dismiss because a lot of times they are really summary

1  judgment motions masquerading as motions to dismiss.  But I

2  leave that up to you.

3          MR. KLAPMAN:  Yeah, I understand, Judge.  And I don't

4  need to make a record, Judge, in regards to providing you

5  hooks to hang your hat on in regards to the TRO.  But you've

6  made your decision and --

7          THE COURT:  Okay.  Very well.

8          MR. KLAPMAN:  -- we'll -- we'll put it in the brief,

9  your Honor.

10          THE COURT:  Very well.  Anything further from you,

11  Mr. Klapman?

12          MR. KLAPMAN:  No.  I think we've got it covered, your

13  Honor.  We'll address it in the brief.

14          THE COURT:  Mr. Walker?

15          MR. WALKER:  Nothing else, your Honor.

16          THE COURT:  Very well.  Thank you.

17          Mr. McClain, notwithstanding my comments at the

18  beginning of the hearing, you've done a very fine job on

19  behalf of your client.

20          What I said earlier about Mr. McKenna, though, I do

21  take seriously because a case like this -- he filed an

22  appearance; he's lead counsel -- he should be here at future

23  hearings.  I'll expect him here by telephone on the 19th.

24          MR. McCLAIN:  Understood.  Thank you for your time,

25  your Honor.

1        THE COURT:  Thank you all.  Have a good rest of the

2   holiday season and a good New Year and we'll talk to you in

3   January.  Thank you.

4        MR. McCLAIN:  Thank you, your Honor.

5        MR. WALKER:  Thank you, your Honor.

6        MR. KLAPMAN:  Thank you, your Honor.

7     (Which were all the proceedings had.)

8                    *    *    *    *    *

9

10  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
11

12
    /s/ Nancy C. LaBella                 January 15, 2024
13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25